IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LATRIVIA EVETTE HARRIS — PLAINTIFF

v. — Civil No. 06-2022

SGT. CROUCH; DEPUTY PATE; and DEPUTY HALSEY — DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. She proceeds pro se and in forma pauperis.

The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Sebastian County Detention Center. Defendants filed a summary judgment motion (Doc. 23). To assist plaintiff in responding to the summary judgment motion, a questionnaire was propounded (Doc. 27).

Plaintiff filed a response to the questionnaire (Doc. 28). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

**Background**

On May 8, 2000, Latriva Harris was given a conditional release from the Arkansas Post Prison Transfer Board. *Plaintiff's Response* (*hereinafter Resp.*)(Doc. 28) at ¶ 1. Harris was booked into the Sebastian county Detention Center (SCDC) on August 26, 2005. *Id.* at ¶ 4.



AO72A
(Rev. 8/82)

Her original charge was murder in the first degree and she was held on the parole violation without bond. *Resp.* at ¶ 5. She was transported from the San Joaquin County Sheriff's Office. *Id.*

At the time of booking, Harris completed a medical questionnaire indicating she had no health problems other than high blood pressure. *Resp.* at ¶ 6. Harris remained at the SCDC until she was transported to the Arkansas Department of Correction (ADC) on February 15, 2006. *Id.* at ¶ 7.

On September 13, 2005, Harris was involved in an altercation with Whitney Wright, a fellow inmate. *Resp.* at ¶ 8. Harris maintains she was protecting herself. *Id.* According to Harris, Wright wanted three of her friends to lock down in the cell that was only assigned to Harris and Wright. *Id.* Harris states she was getting the others out of the cell. *Id.*

According to an incident report prepared by Deputy Vezina, he and Deputy Crouch heard Harris and Wright fighting in CD 21. *Defts' Ex.* 2 at page 1. They also heard the two yelling at each other. *Id.* Vezina reported that she gave both inmates a quick burst of OC spray and they quit fighting. *Id.* Harris, however, states they stopped fighting before Vezina got up the stairs. *Resp.* at ¶ 10.

Harris was wearing a white t-shirt that was ripped in half. *Resp.* at ¶ 11. According to Vezina's incident report, while she waited for assistance to move Harris and Wright up front to decontaminate, Harris and Wright started cussing each other and started toward each other. *Defts' Ex.* 2 at page 1. Vezina therefore gave Harris another quick burst of OC spray. *Id.*



AO72A
(Rev. 8/82)

In contrast, Harris states the fight was over but Wright said: "F— You." Harris replied: "F— You." *Resp.* at ¶ 12. Harris indicated they never moved towards each other but Vezina still gave them each another long burst without warning. *Id.* Harris and Wright were then taken to the intake area to be decontaminated. *Id.*

On October 1st, Harris submitted a grievance stating that she was not allowed to shower after working. *Resp.* at ¶ 14. As a trustee, she stated she should be allowed to shower after every shift. *Id.* Sgt. Ritter responded that Harris could take a shower after the first two shifts during her break time. *Id.* at ¶ 15.

On December 25th, Sgt. Crouch submitted a jail incident report indicating that Deputies Pate and Halsey had spoken with inmate Joni Chabot regarding threats Harris made against her. *Defts' Ex.* 2 at page 2. The incident report indicates that Harris' trustee job had been taken away from her two rotations ago because she had cussed at Pate. *Id.* According to Harris, her trustee job was taken away because she flushed items her cellmate stole from the kitchen and then she tried to report it to Pate. *Resp.* at ¶ 17.

Joni Chabot told Sgt. Crouch that every time a new inmate was assigned to Harris' cell she would intimidate them until they wanted to move out of the cell. *Defts' Ex.* 2 at page 2. Sgt. Crouch concluded Harris had violated standard operating procedure 3.02 that stated that if a detainee needs to be separated because they pose a threat of danger to other inmates they may be placed on administrative segregation. *Id.* It also states an inmate may be placed on administrative segregation for her own safety. *Id.*

Crouch discussed the matter with Pate and Halsey and decided to assign Harris to administrative segregation for the remainder of her stay. *Defts' Ex.* 2 at page 2. Harris states although she repeatedly asked why she was being segregated no one would explain it to her until she began requesting to speak to higher ups. *Resp.* at ¶ 20(B). Instead, she states she was merely escorted from the kitchen to a cell. *Id.*

On January 19, 2006, Harris submitted a grievance about being in segregation since Christmas without being given a reason or without receiving any paperwork. *Resp.* at ¶ 21. Crouch responded in writing that he had discussed the issue with Harris on January 18th and she had been placed in segregation because of threats made against her and because she had made threats against others. *Defts' Ex.* 3 at page 2. Lt. Jackson also responded stating that she had discussed this with Harris in person and that she would be moved to general population. *Resp.* at ¶ 23; *Defts' Ex.* 3 at page 2. Jackson said Harris was originally moved to segregation for the safety and security of the pod. *Id.*

On January 26, 2006, Harris submitted a grievance that said although Crouch had said she was on administrative segregation she was being governed under the same rules as punitive segregation. *Resp.* at ¶ 24(A). Harris stated she could not eat at the table during meals and could not have television or newspapers. *Id.*

Harris was asked to describe the differences between being housed in the general population and in administrative segregation. She responded as follows:

> The two isolation cells w[]ere being used to house people with mental problems before they moved me there. There was fecal matter, pee and food all over the walls and they would not allow me to have anything to clean with. Most of the time I had to take meals inside that cell. I was not allowed to sit at the table.



AO72A
(Rev. 8/82)

> When I refused to eat, Deputy Pate threatened to send me to the padded room, where I would have no clothes or privacy. I was forced to serve the other 'mental' people in the cell they're meals before I could eat. In general pop. everyone comes out the cell gets they're tray and eats at the table. There is a television that was on in the day area and cleaning supplies are made available.

*Resp.* at ¶ 24(B). Harris indicates she was the only one in these cells under administrative segregation. *Id.* at ¶ 24(C).

On January 26th, Harris asked to talk to Jackson regarding the "extreme prejudice" being shown to her by Crouch, Pate, and Halsey. *Resp.* at ¶ 26. Jackson responded that she had discussed with Harris the reasons she was in segregation. *Id.* at ¶ 27.

On January 28th, Harris states she complained about what she felt was cruel and unusual punishment as a ward of the Arkansas Department of Correction (ADC). *Resp.* at ¶ 28. Sgt. Ritter responded that they did not control when Harris went to the ADC. *Id.* at ¶ 29. He also said Harris would remain on administrative segregation. *Id.*

Jackson advised all deputies on January 30th, that Harris had been moved to general population that day. *Defts' Ex.* 2 at page 3. According to Jackson's memorandum, Harris told Jackson she did not have a problem with anyone in general population. *Id.* Chabot also stated she did not have a problem with Harris but did not want to be in the same cell with her because she blamed Chabot for getting fired. Jackson said Harris would be tried in general population but if there was more fighting she could go back on administrative segregation. *Id.*

On February 2nd, Harris complained she was having to sleep next to a toilet because there were four people in a cell. *Resp.* at ¶ 31. Halsey responded there were a lot of inmates and a lot of rooms with the same problem and that as soon as the number of inmates decreased they



AO72A
(Rev. 8/82)

would spread people out. *Id.* at ¶ 32. Crouch responded that the cell adjoining Harris' would be repaired by February 2nd and that would relieve some of the overcrowding. *Id.* at ¶ 33.

Harris was asked to describe in detail how she believed Crouch violated her federal constitutional rights. She responded that he did not investigate what Chabot said. *Resp.* at ¶ 34. Harris maintains Crouch did not even ask the other cellmates if what Chabot said was true. *Id.* Harris also indicates she reported to Crouch that Pate allowed the trustees to bring stolen items back from the kitchen. *Id.* Harris asserts Crouch allowed Pate and Halsey to retaliate against her by encouraging inmates to jump on her and assigning her to a cell with a girl who said she would jump on Harris if they placed her in that cell. *Id.*

With respect to Pate, Harris states Pate fired her from her trustee position when she reported that her roommates were stealing from the kitchen. *Resp.* at ¶ 35. Harris also maintains Pate allowed the inmates to agitate and provoke her in hopes that she would fight. *Id.* Harris indicates Pate knew Harris had complained about the inmates smoking inside the cells and that is why no one wanted to room with Harris. *Id.* Finally, Harris states Pate threatened to stick her in the padded room where she would not have any clothes because she did not want to get her trays in isolation where the odor was bad and they hardly cleaned up. *Id.*

With respect to Halsey, Harris contends Halsey did not investigate with the other roommates whether Chabot's words were true. *Resp.* at ¶ 36. Harris also asserts Halsey assigned her to a cell where another inmate said she would jump on Harris. *Id.* Harris indicates Halsey kept them locked down twenty-three hours a day so they could not shower or clean their cells. *Id.* Harris also indicates Halsey knew she had problems being locked down with inmates who smoked but told Crouch she had problems with everyone. *Id.* Finally, Harris maintains

Halsey came to punitive isolation and asked Harris who was bringing cigarettes in. *Id.* Because Harris did not know, she maintains Halsey just left her back there. *Id.*

**Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

**Discussion**

Defendants have now moved for summary judgment. First, they contend Harris had no protected liberty interest in being a trustee. Second, they contend her claims that she was assigned to a cell with an inmate with whom she had problems fail because there is no evidence she suffered any damages. Third, they contend her claims that she was administrative segregation fail because such assignment did not result in an atypical and significant deprivation.



AO72A
(Rev. 8/82)

***Loss of the Trustee Job***

Harris contends she was wrongfully removed from a position as trustee. According to defendants, the trustee job was taken away from Harris for cussing at Pate. *Defts' Ex.* 2 at page 2. According to Harris, the job was taken from her because she flushed items her cellmate stole from the kitchen and then tried to report it to Pate. *Resp.* at ¶ 17.

Clearly no claim of constitutional dimension is stated. Harris had no liberty interest in the trustee job. *See Ricker v. Leapley*, 25 F.3d 1406 (8th Cir. 1994)(A state prisoner has no protected liberty interest in being a trustee). She was therefore "not entitled to procedural due process safeguards" in connection with the loss of the trustee position. *Dawson v. Kendrick*, 527 F. Supp. 1252, 1305 (S.D. W. Va. 1981).

***Cell Assignment***

Harris contends defendants placed her in a particular cell where they knew an inmate had a problem with her. On the record before us, there is no indication that plaintiff suffered any harm as a result of the cell assignment and no genuine issue of material fact as to whether defendants were deliberately indifferent to the existence of conditions posing a substantial risk of serious harm to Harris or other inmates. *See e.g., Ambrose v. Young*, 474 F.3d 1070 (8th Cir. 2007).

With respect to the cell assignment itself, we find no claim of constitutional dimension is stated. A prisoner is not entitled to a particular cell assignment. *See e.g., Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978).



AO72A
(Rev. 8/82)

***Placement in Administrative Segregation***

In this case, Harris was given a conditional release by the Arkansas Post Prison Transfer Board. *Resp.* at ¶ 1. She was booked into the SCDC on a parole violation and a warrant for the retaking of a prisoner had been issued for her arrest. *Resp.* at ¶ 3 & ¶ 5.

The Supreme Court has held that inmates have no liberty interest in their institutional assignments. *Olim v. Wakinekona*, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983). Although it has been said that a prison can transfer an inmate for any reason or no reason, this statement is subject to the limitation that an inmate may not be transferred in retaliation for exercising a constitutional right. *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993). In this case, Harris has not alleged that she was transferred in retaliation for her exercise of a constitutional right. Instead, she merely alleges her transfer was unconstitutional because defendants did not investigate her complaints, or what Chabot said, failed to inform her why she was placed in segregation, and the transfer greatly affected the conditions under which she was confined. She indicates the cell she was in was filthy, she was not given an opportunity to clean, she was forced to eat in the cell instead of at a table, had to feed the other mental inmates their meals before she could eat, and there was no television. *Resp.* at ¶ 24(B).

"Government actions affecting the conditions of prison confinement implicate a prisoner's constitutional rights only where the actions impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ware v. Morrison*, 276 F.3d 385, 387 (8th Cir. 2002)(*citing Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)(failure to allow inmate to present witnesses at disciplinary hearing, after which he was placed in disciplinary segregation for 30 days, did not deprive inmate of



AO72A
(Rev. 8/82)

liberty interest protected by the due process clause)). "An inmate who makes a due process challenge to [her] segregated confinement 'must make a threshold showing that the deprivation of which [she] complains imposed an atypical and significant hardship.'" *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002)(*quoting Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000)).

The denial of a hearing is not considered in determining whether a liberty interest was affected. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). Rather, "to determine whether an inmate possess a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those [s]he . . . could 'expect to experience as an ordinary incident of prison life.'" *Id.* (citation omitted). The Eighth Circuit has consistently held that "administrative and disciplinary segregation are not atypical and significant hardships under *Sandin*." *Portley-El*, 288 F.3d at 1065. *See also Martin v. Scott*, 156 F.3d 578, 580 (5th Cir. 1998)("absent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life of a prisoner, will never be a ground for constitutional claim because it simply does not constitute a deprivation of a constitutionally cognizable liberty interest."); *Crowder v. True*, 74 F.3d 812, 814-15 (7th Cir. 1996)(federal prisoner's detention for three months in administrative segregation did not constitute a significant, atypical hardship which constituted a deprivation of a liberty interest.

We believe there are genuine issues of material fact that preclude summary judgment in the defendants' favor on this claim. Harris alleges she was denied cleaning materials and forced to remain on lock-down in a cell with the walls covered with, among other things, fecal matter. She also contends she was forced to eat in this cell.



AO72A
(Rev. 8/82)

**Conclusion**

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 23) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to plaintiff's claims that her constitutional rights were violated when she was removed from her position as trustee and placed in a cell with an inmate who she had problems with. I believe the motion should be denied with respect to her claim that her constitutional rights were violated when she was placed in administrative segregation.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of August 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE



AO72A
(Rev. 8/82)